**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**SALLY JANE BREEN,**

      **Plaintiff,**

**vs.**                      **Case No.: 5:12cv257-CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**
_____/

**MEMORANDUM OPINION AND ORDER**

This is a Social Security case referred to the undersigned U.S. Magistrate Judge

upon consent of the parties and reference by Senior District Judge Maurice M. Paul.

Doc. 10.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the

entire Record, the decision of the Commissioner is affirmed.

**I.  Procedural History**

On December 5, 2008, Plaintiff, Sally Jane Breen, filed applications for

Supplemental Security Income (SIS) and Disability Insurance Benefits (DIB), alleging

disability beginning May 23, 2005.  R. 22, 168-75.  (Citations to the Record shall be by

the symbol "R." followed by a page number that appears in the lower right corner.)

Plaintiff's DIB application was denied on December 15, 2008, because Plaintiff had not

worked long enough to qualify for disability benefits.  R. 76-78.  Plaintiff's SIS

application was denied initially on February 10, 2009, and upon reconsideration on or

about June 29, 2009.  R. 22, 80-91.  On August 13, 2009, Plaintiff filed a request for hearing.  R. 22, 93-95.

On July 14, 2010, the first of two hearings was held and conducted by Administrative Law Judge (ALJ) Teresa J. Davenport in Panama City, Florida.  R. 50-73.  Plaintiff was represented by Quinn E. Brock, an attorney.  R. 50, 52.  Plaintiff testified during the hearing.  R. 52-71.  Donna P. Mancini, a vocational expert, also testified.  R. 71-72, 128-29 (Resume).  Ms. Mancini briefly identified Plaintiff's past work as a cashier/checker and opined that there are jobs that can be done in this position with sit/stand option.  R. 72.  Ms. Mancini further opined that if Plaintiff's doctor indicated that Plaintiff would only be able to sit for one hour and stand for one hour in a workday, with missing four days per month, that these restrictions would not allow Plaintiff to do competitive work.  R. 72.  The ALJ advised that Plaintiff would be referred to a doctor (either orthopedic or neurologist) for an examination.  R. 53, 71.  The hearing was concluded without a decision.  R. 73.  At the request of the ALJ, on August 17, 2010, E. Jacob, M.D., who is board certified in neurology, R. 446, performed a consultative examination of Plaintiff.  R. 437-39, 441-46.

On December 8, 2010, a second hearing was conducted by ALJ Davenport.  R. 32-73.  Plaintiff was represented by Joshua B. Beard, an attorney.  R. 31, 33-34, 37.  (Mr. Quinn and Mr. Beard are in the same law firm.  R. 31.)  The ALJ advised that she was in receipt of Dr. Jacob's examination report.  R. 34.  Plaintiff briefly testified during the hearing.  R. 37-40.  Mark A. Capps, M.S., C.R.C., C.V.E., a vocational expert, also testified.  R. 40-45, 166-67 (Resume).

On January 12, 2011, ALJ McGarry, formerly Davenport, entered a decision denying Plaintiff's SIS application for benefits.  R. 22-29.  On February 5, 2011, Plaintiff filed a request for review and submitted a brief in support.  R. 4-5, 17, 253-56.  On June 28, 2012, the Appeals Council denied Plaintiff's request for review.  R. 1-6.  On August 9, 2012, Plaintiff filed a Complaint in this Court seeking judicial review.  Doc. 1.  The parties filed memoranda of law, docs. 14 and 17, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant was born on March 30, 1963 and was 45 years of age, which is defined as a younger individual age 18-44, on the date the application was filed. . . .The claimant has a limited education and is able to communicate in English."  R. 28.

2. "The claimant has not engaged in substantial gainful activity since December 5, 2008, the application date."  R. 24.

3. "The claimant has the following severe impairment: thoracic degenerative disc disease with herniated nucleus pulposus. . . .

   The claimant reporting falling and injuring her back in 2005 (Exhibit 6F) [R. 264].  An MRI of the thoracic spine on August 20, 2005 showed degenerative changes throughout the thoracic spine and small disc protrusion or developing disc extrusions (disc herniation) present near the midline at T7-8 and T8-9.  There was no impingement of the cord but there was a left posterolateral disc protrusion superimposed on asymmetric spondylosis at T11-12 (Exhibit 2F) [R. 269].  An MRI of the lumbar spine showed mild midline disc bulge at L4-5 with degenerative facet joint changes bilaterally at this level as well as at L5-S1 (Exhibit 2F) [R. 268].  Physical examination showed a full and active range of motion about the thoracic spine, although there was tenderness to palpitation at Tl2-L1 and pain with flexion/extension (Exhibit 2F) [R. 264].  Her doctor sent her for epidural steroid injections [R. 262].  Additional treatment included Celebrex, Lortab and Lyrica (Exhibit 3F) [R. 275].  Medical notes indicate surgery took place in 2005 [R. 274], but those records are not included in evidence (Exhibit 3F).

The claimant continued to complain of pain.[1]  Physical examination in April 2007 resulted in positive straight leg raises and mild tenderness along the spinous processes of the mid-thoracic spine (Exhibit 3F) [R. 272].  Despite this, the claimant had normal motor strength, sensory examination, deep tendon reflexes and gait (Exhibit 3F) [R. 272].  Imaging showed multiple small midline disc herniations with two prominent exceptions at T11-12 and T6-7 that appeared to contact the cord, but no clinical evidence of myelopathy (Exhibit 3F) [R. 278-79].  Imaging also showed early degenerative change through the cervical spine, with the only area of stenosis in the left C4 root (Exhibit 3F) [R. 277].  An MRI of the thoracic spine showed accelerated thoracic spine degenerative disc disease, lower aspect, with multilevel areas of mild to moderate spine cord compression with no high grade stenosis due to a capacious spine canal, no evidence of neoplasia and no primary myelopathy (Exhibits 3F and 4F) [R. 278-79. 294].  An MRI of the lumbar spine showed mild degenerative disc disease at the bottom three lumbar levels in particular without any evidence of high grade or significant stenosis and mild disc protrusion into the left L4 root foramen (Exhibits 3F and 4F) [R. 280, 292].

Treatment included only four sessions of physical therapy and referrals to pain management, with notes that her pain could primarily be controlled with non-narcotic medication (Exhibits 5F [R. 302-10], 7F [R. 326-32], 10F [R. 343-57] and 20F [R. 410-35]).[2]  Notes from October 2007 record that the claimant had not responded to thoracic epidural or facet steroid injections (Exhibit 5F) [R. 310].  In September 2009, the claimant reported decreased endurance and muscle spasms (Exhibit 16F) [R. 381].  Physical examination showed muscle wasting in her upper right thigh (Exhibit 16F) [R. 381]. She continued to report pain in her back, describing it in May 2010 as sharp and burning and noted numbness in her leg and hip (Exhibit 19F) [R. 404].

---

1  On March 30, 2007, Plaintiff established care with Laura A. Yauch, M.D. R. 275.

2  A July 10, 2007, prescription update indicates that Plaintiff was seen for a total of 12 visits of physical therapy and last seen on June 15, 2007, when Plaintiff reported no pain and that all "STG's" from a re-evaluation on May 22, 2007, had been met. Plaintiff had cancelled her last two appointments and had not re-scheduled an appointment.  As a result, Plaintiff was discharged.  R. 281.  (One exercise/activity flow sheet indicates Plaintiff had four therapy sessions in April and May 2007.  R. 433.) Dr. Zwingelberg noted on June 11, 2007, that Dr. Yauch examined Plaintiff on May 18, 2007, for continuing back problems and that Plaintiff had "not continued her physical therapy or had any sort of pain management."  R. 302.

The claimant also reported conditions that would not reasonably be expected to last for at least twelve months, such as stomach issues (Exhibits 18F [R. 401-01] and 19F [R. 404]).

The claimant's doctor reported that she had been diagnosed with a transient ischemic attack (TIA) (Exhibit 10F) [R. 353]. The record does not contain evidence of any diagnostic evidence of a TIA or that the claimant was referred to a neurologist for that issue. An impairment must result from anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical and laboratory diagnostic techniques. The existence of an impairment cannot be established on the basis of symptoms alone, no matter how genuine the claimant's complaints may appear to be. Based on the standard set forth in SSR 96-4p, I find that a TIA is not a medically determinable impairment.

Dr. E. Jacob performed a consultative examination on August 17, 2010 (Exhibit 21F) [R. 436-46]. The claimant complained of back pain that had been present for about five years and was made worse by prolonged standing and sitting, bending, stooping and by climbing steps and stairs. After physical examination, Dr. Jacob reported that she had no tenderness over the spinous processes and no muscle spasms. Straight leg raises were negative. He reported that the claimant was able to perform toe-walk, heel-walk and tandem-walk and that sensation was normal (Exhibit 21 F). He did report depressed reflexes, absent ankle jerks and downgoing plantar (Exhibit 21 F)." R. 24-25.

The ALJ further found:

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . .

I have considered Listing 1.04, *Disorders of the spine,* and finds [sic] that the evidence does not supporting finding that the claimant has a spinal disorder (nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate

medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively." R. 25-26.

5. "[T]he claimant has the residual functional capacity [RFC] to perform a full range of sedentary work as defined in 20 C.F.R. § 416.967(a). . . .

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)-i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that she has pain in her mid- to lower-back that causes a burning, stabbing pain and numbness [R. 65]. She stated that her doctor told her that her only option was pain medication [R. 66-67]. She reported that she was able to stand for five to ten minutes and has to sit because her back and legs go numb [R. 37-38, 68-70]. She noted that she could walk fifteen minutes. She testified that she could sit for two minutes before changing position and 20 to 30 minutes before having to stand [R. 38-39]. She indicated that it was hard to bend, stoop or squat [R. 38]. She noted that

she does not reach overhead.  She reported that her medications make her sleepy [R. 71].

After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The record supports finding that the claimant has a severe impairment that will limit her ability to perform work related activities.  The claimant's spinal disorder will limit her ability to lift/carry, sit/stand and push/pull.  These limitations have been taken into consideration in the residual functional capacity.  The claimant's allegations are not fully credible, however.  The claimant's treatment has been conservative.  The record shows only four sessions of physical therapy and minimal attempts at steroid injections [R. 305, 308, 310, 433; *but see* R. 281 (12 visits of PT)].  Imaging of the spine shows primarily mild degenerative changes [R. 271-73].  The claimant is able to ambulate effectively.  The claimant's pain management physician reported that her symptoms could be controlled with non-narcotic medication, using Lortab only for break-through pain [R. 310].

Dr. Laura Yauch completed a Treating Source Orthopedic Questionnaire dated January 7, 2009 (Exhibit 9F) [R. 342].  She reported that the claimant had gait disturbance, chronic pain, radiculopathy and a limited range of motion of the lumbar spine of 50 percent flexion (Exhibit 9F) [R. 342].  She stated that the claimant had reduced lower extremity strength.  She added that she did not require an assistive device to ambulate.  Dr. Yauch stated that the claimant had a limited ability to sit more than five minutes without a change in body position (Exhibit 9F) [R. 342].  Dr. Yauch also completed a Physical Capacities Evaluation dated November 2, 2009 (Exhibit 17F) [R. 386-87].  Dr. Yauch checked on the form that the claimant was limited in her ability to lift/carry five pounds frequently or heavier amounts.  She believed that the claimant could sit or stand/walk for one hour per eight-hour workday.  She stated that the claimant could never climb (stairs or ladders) or balance, perform bending/stooping movements, reach (including overhead) or work around hazardous machinery.  She reported that the claimant could rarely perform push/pulling movement (arm and/or leg controls), gross manipulation (grasping, twisting and handling), or operate motor vehicles (Exhibit 17F) [R. 386].  She noted that the claimant could occasionally perform fine manipulation (finger dexterity).  Dr. Yauch stated that the claimant would likely be absent from work as a result of her impairment or treatment more than four

days per month (Exhibit 17F) [R. 386]. The opinions of Dr. Yauch are given limited weight. Her statements are not supported by the medical evidence. Dr. Yauch is a family practitioner and does not specialize in the area of neurology, and thus, her opinion is given less weight than that of Dr. Jacob.

Dr. E. Jacob, a consultative examiner, completed a Medical Source Statement of Ability to do Work-Related Activities dated August 17, 2010 (Exhibit 21F) [R. 441-46]. He reported that the claimant could frequently lift up to twenty pounds and could occasionally lift 21 to 50 pounds. He believed that the claimant could frequently carry up to ten pounds and occasionally carry 11 to 50 pounds (Exhibit 21F) [R. 441]. He stated that the claimant could sit for one hour without interruption, stand for 30 to 40 minutes without interruption and walk for 30 minutes without interruption [R. 442]. He indicated that the claimant could sit for six hours total in an eight-hour workday, stand for two hours in an eight-hour workday and walk for one hour in an eight-hour workday [R. 442]. He found that the claimant had no limitations in her use of hands or feet [R. 443]. He recorded that the claimant could occasionally climb stairs and ramps, climb ladders and scaffolds, balance, stoop, kneel, crouch or crawl [R. 444]. He believed that the claimant could occasionally tolerate exposure to unprotected heights and moving mechanical parts and frequently tolerate exposure to' operating a motor vehicle (Exhibit 21 F) [R. 445]. Dr. Jacob's opinion is not inconsistent with the ability to perform work at a sedentary level. His opinion is given great weight.

A state agency medical consultant completed a physical residual functional capacity assessment dated February 9, 2009, in which she assessed the claimant as able to perform at a sedentary exertional level (Exhibit 12F) [R. 360-64]. He also believed that the claimant could never climb ladders, ropes and scaffolds, and only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl (Exhibit 12F) [R. 361]. I assign limited weight to this opinion.

A state agency medical consultant completed a physical residual functional assessment dated June 11, 2009 in which he assessed the claimant as able to perform work at a sedentary exertional level (Exhibit 14F) [R. 371-75]. He also believed that the claimant could never climb ladders, ropes or scaffolds, and could only occasionally climb ramps, stairs, balance, stoop, kneel, crouch or crawl (Exhibit 14F) [R. 372]. I assign limited weight to this opinion." R. 26-28.

6. "The claimant is unable to perform any past relevant work [as a cashier that exceeds Plaintiff's RFC.]" R. 28.

7. "Transferability of job skills is not material to the determination of disability. . . ." R. 28.

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform [such as ticket taker (light/SVP2), warehouse checker (light-SVP2), and order clerk food and beverage (sedentary/SVP2)]. . . . The Vocational Expert testified that the jobs identified could be done in a sedentary position based on knowledge of the jobs." R. 28-29; *see* R. 44-45.

## III. Medical and Other Evidence

Plaintiff alleges she fell and injured her back in 2005. R. 264. In August 2005, Plaintiff presented to Cory R. Gaiser, D.O., with complaints of back pain for 2-3 weeks with some relief from Advil. R. 264. Dr. Gaiser diagnosed Plaintiff with thoracolumbar spondylosis. R. 263. The physical examination revealed full active range of motion in the cervical and thoracic spine, a normal gait and not antalgic with the ability to heal-toe walk effectively, no gross atrophy, muscle strength testing is equal in the lower extremities, and normal reflexes. R. 263-64.

In August 2005, a thoracic MRI revealed degenerative changes throughout the thoracic spine, small disc protrusion or developing disc extrusions (disc herniation) at T7-8 and T8-9, and no cord impingement. R. 266. A lumbar MRI revealed mild disc bulge at L4-5, mild midline disc bulge at L4-5 and L5-S1, no nerve root impingement, no stenosis, and no focal disc abnormality. R. 267. Dr. Gaiser prescribed Mobic, Skelaxin, and Lortab for her symptoms, and recommended steroid injections (by Dr. Zwingelberg) and a back brace. R. 262-63. In December 2005, Plaintiff had an arthroscopic laser procedure on her lumbar spine. She reported that the procedure provided her with "good relief." R. 271, 274, 302.

There is a gap in the medical evidence from December 2005 until March of 2007 when a thoracic MRI revealed accelerated generative disc disease mild-to-moderate spinal cord compression, no high-grade stenosis due to a capacious spinal canal, slight hyperkyphosis disc herniations and protrusions at T6-7 and T 11-12, no evidence of neoplasia, prior trauma, congenital anomaly, or spondylolisthesis, no primary myelopathy, and normal spinal cord signal despite displacement.  R. 278-79; *see infra* n.4.  A lumbar MRI revealed mild the generative disc disease, no evidence of stenosis, tumor, trauma, instability, or congenital anomaly, and a slight disc protrusion at L4 without nerve root compression.  R. 271, 280.  A cervical MRI revealed good alignment of the vertebral bodies, "very early" degenerative changes, moderate stenosis at C3-4, slight strengthening of the cervical lordotic curve, no trauma, no instability, and no congenital anomaly.  R. 271, 277.

In March 2007, Plaintiff established treatment for the first time with Laura A. Yauch, M.D., a primary care physician, for back and neck pain and hand discomfort. R. 274, 331.  Although Plaintiff had a reduced range of motion and reflexes in her back, she had good range of motion in her neck and negative straight leg raise.  R. 274. Dr. Yauch prescribed Lyrica, Celebrex, and Lortab.  R. 275.  Plaintiff did "relatively well" on the medication and appeared much more comfortable.  R. 275, 332; *see* R. 329 (5/18/07 physical).

In April 2007, Gus Arriola, M.D., a neurosurgeon, examined Plaintiff and reviewed her March 2007 MRIs.  R. 271.  Although Plaintiff had mild tenderness along her mid-thoracic spine, she had no tenderness along the cervical and lumbar spine.

R. 272.  Plaintiff had full motor strength in her lower extremities, no atrophy or muscle

wasting, no evidence of rigidity or spasticity, intact sensation, normal reflexes, a normal

gait, and good heel and toe walking.  R. 272.  Although Plaintiff stated that her pain

radiated down her sides, Dr. Arriola noted that Plaintiff did not have true radicular pain

because her pain did not distribute in a band-like fashion.  R. 271.  Dr. Arriola stated

that Plaintiff had degenerative disc disease at various stages, which was most

pronounced in the thoracic spine.  R. 271, 273.  Dr. Arriola also stated that Plaintiff had

multiple small midline disc herniations that did not compromise the court, a moderately

large disc herniation at T11 and a lesser herniation at T6-7 that slightly compressed the

cord, and no clinical evidence of myelopathy.  R. 271-73.  Dr. Arriola concluded that

Plaintiff was not a surgical candidate and that she would be best treated with physical

therapy and pain management including medication and steroid injections.  R. 273.

Between April and June 2007, Plaintiff attended physical therapy.

R. 281-84, 412-17, 423-27, 432-33, 449.[3]  Although Plaintiff reported some soreness

after her initial physical therapy sessions, her therapist noted that Plaintiff made good

progress with the program.  R. 412-13.  By mid-May 2007, Plaintiff stopped going to

physical therapy.  R. 329.  At this time, Plaintiff took Lortab, Celebrex, Lyrica, and

Mobic.  R. 329.  At the suggestion of Dr. Yauch, Plaintiff resumed physical therapy.

R. 282.  After the last session on June 15, 2007, Plaintiff reported no pain.  R. 281.  In

July 2007, it was noted that Plaintiff cancelled her last two appointments and had not re-

---

[3]  It appears that Plaintiff had "12 visits of PT," rather than four as found by the ALJ, R. 27.  *Compare* R. 281 *with* R. 433.

scheduled a session.  Plaintiff was discharged from physical therapy.  R. 281.

Between June and October 2007, Plaintiff was treated by Keith M. Zwingelberg, M.D., a pain management specialist.  R. 302-10.  Plaintiff reported that Lortab, Celebrex, and Lyrica helped reduce her pain and physical therapy, chiropractic therapy, and massage also helped some.  R. 302.  "A combination of heating pad, pain medication and lying down totally alleviates her pain."  R. 302.  Plaintiff ambulated with assistance.  R. 303.  Plaintiff had some pain along her spine on palpation and decreased range of motion in her neck on the right side; however, Plaintiff had no acute distress, normal reflexes, intact sensation, negative straight leg raises, and normal muscle strength.  R. 303.  Dr. Zwingelberg noted that Plaintiff was not a surgical candidate.  R. 310.  Dr. Zwingelberg recommended that Plaintiff have a rheumatology workup, have an epidural injection, and undergo a trial of Ultram.  R. 304.  Plaintiff never had a rheumatology examination.  R. 55.  Plaintiff received two steroid injections in her thoracic spine, but did not respond to them.  R. 305, 308, 310.  In October 2007, Dr. Zwingelberg released Plaintiff back to the care of Dr. Yauch for long-term pain management with mostly non-narcotic medications and Lortab for break-through pain only.  R. 310.  Plaintiff's prescriptions were Celebrex, Lyrica, Ultram, Zanaflex, and Lortab.  R. 310.

Between August 2007, and January 2008, Dr. Yauch continued to prescribe Plaintiff medications.  R. 326-28, 352.  In August 2007, Plaintiff reported some dizziness the prior night for about five minutes; inability to walk, but did not pass out.  R. 328.  An EKG was normal.  Dr. Yauch recommended a second opinion from neurology.  R. 328.

In October 2007, Dr. Yauch noted that Plaintiff had decreased flexion and extension of the cervical spine. R. 352. In November 2007, Karin S. Maddox, M.D., a neurologist, examined Plaintiff. R. 346, 357. Plaintiff had a normal gait, normal reflexes, normal strength, and intact sensation. Dr. Maddox did not find a neurological reason for the dizziness. R. 346, 357. In December 2007, Plaintiff reported that Lortab and Ultram helped reduce her pain. R. 327, 351. In January 2008, Plaintiff reported no reoccurrence of her previous TIA issues. R. 326.

There is another gap in the medical evidence between on or about January 2008 until January 7, 2009, when Plaintiff returned to Dr. Yauch and asked her to complete disability paperwork. R. 349; *see infra* n.4. Dr. Yauch completed a Treating Source Orthopedic Questionnaire. R. 342. In a patient note, Dr. Yauch indicated that Plaintiff had normal range of motion in her neck, shoulders, and hands, but decreased reflexes and strength in her lower extremities. R. 349. In the questionnaire, Dr. Yauch also noted that Plaintiff's symptoms included chronic pain, radiculopathy, gait disturbance, and limited range of motion in her lumbar spine. R. 342. Her lower extremity strength was 2/5. She also stated that it was not medically necessary for Plaintiff to ambulate independently with a hand-held assistive device. R. 342.

In June 2009, Clarence Louis, M.D., completed a Physical Residual Functional Capacity Assessment. R. 370-77. Dr. Louis concluded that Plaintiff was capable of occasionally lifting ten pounds; frequently lifting less than ten pounds; standing and/or walking at least two hours in an eight-hour workday; sitting about six hours in an eight-hour workday; pushing and pulling without limitation; occasionally climbing ramps and

stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, and scaffolds. R. 371-72. Dr. Louis indicated that a medical source statement(s) regarding Plaintiff's physical capacities was within the file and further indicated that there were no medical source conclusions about Plaintiff's limitations or restrictions which are significantly different from his findings. R. 376.

On September 15, 2009, Plaintiff returned to Dr. Yauch for a routine appointment to refill her prescriptions. R. 381. Plaintiff reported being very tired all of the time; that she was unable to receive support from Medicare, Medicaid, etc.; that her husband was out of work; that she was taking Lortab, but she used her husband's Celebrex intermittently; and used her Mobic secondary for cost reasons. Lyrica did not help. Plaintiff used Ultram. Plaintiff also reported continued "TIAs," especially if she missed taking a baby aspirin. Dr. Yauch suggested she take a full-strength aspirin every day. R. 381. Plaintiff had some muscle wasting on her right upper thigh and complained of pain with axial loading, forward motion of her head down with both arms, and straight leg raising. R. 381. Dr. Yauch noted that re-imaging may be needed; however, Plaintiff declined to undergo any additional workup because she could not afford it--she is self-pay. R. 381-82.

In November 2009, Dr. Yauch completed a Physical Capacities Evaluation form indicating that Plaintiff could only lift five pounds occasionally to one pound frequently; sit one hour per day; stand or walk one hour per day; rarely push and pull; never climb, pounds, bend, and student number: and rarely operate motor vehicles. R. 386. Dr. Yauch also stated that Plaintiff did not require an assistive device for walking and

would miss more than four days of work per month. Dr. Yauch stated that Plaintiff could never or rarely perform most functions, e.g., pushing, pulling, bending, etc. R. 386.

In May 2010, Plaintiff returned to Dr. Yauch. R. 404.[4] Plaintiff had pain with straight leg raise bilaterally and decreased deep tendon reflexes at the knees and ankle jerk. Dr. Yauch did not note any muscle atrophy or weakness. R. 404. Plaintiff requested an increase in her doses of Lortab, but reported that Flexeril helped a little bit. R. 404.

In August 2010, E. Jacob, M.D., a board certified neurologist, performed a consultative examination of Plaintiff, R. 437-39, and completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form. R. 441-46. Plaintiff had depressed reflexes and mild scoliosis in her thoracic and lumbar spine; however, she had a full range of motion in her neck, negative straight leg raises, no paravertebral muscle spasms, no tenderness, normal heel-toe walking, and normal sensation. R. 438. Dr. Jacob concluded that Plaintiff remained capable of lifting up to ten pounds frequently, 11 to 20 pounds frequently (with a question mark), 21 to 50 pounds occasionally (with a question mark), and 51 to 100 pounds never; capable of carrying up to ten pounds frequently, 11 to 20 pounds occasionally, 21 to 50 pounds occasionally (with a question mark), and 51 to 100 pounds never; sitting, standing, and walking at one time without interruption for one hour, 30-40 minutes, and 30 minutes, respectively;

---

[4] Plaintiff testified that she had seen Dr. Yauch in September and November 2009 and that there was a period of about four to five months when she did not see her. Plaintiff attributed that to her financial situation and because Dr. Yauch said there was nothing she could do for her except give her prescriptions. R. 66.

sitting for six hours per eight-hour workday (with breaks); standing for two hours per

eight-hour workday (with breaks); walking for one hour per eight-hour workday (with

breaks); ambulated without an assistive device, e.g., a cane; and occasionally climbing

stairs and ramps, balancing, stooping, kneeling.  R. 441-46.  (Dr. Jacob had check and

question marks next to the climbing ladders or scaffolds, crouch, and crawl

(occasionally) entries.  R. 444.)  Plaintiff could occasionally tolerate unprotected heights

and moving mechanical parts, and frequently operate a motor vehicle, and no other

environmental restrictions.  R. 445.  Plaintiff could also engage in other activities such

as shopping, caring for personal hygiene, preparing simple meals, use of public

transportation, and other activities.  R. 446.  Plaintiff had no limitations regarding the

use of her hands and feet.  R. 443.

## IV.  Issues to be Determined

Whether the ALJ erred in finding that Plaintiff's impairment did not meet or equal

Listing 1.04A; whether the ALJ erroneously rejected the opinions of Plaintiff's treating

physician Dr. Yauch and other medical evidence; and whether the ALJ's erred in

applying the three-part pain standard established by the Eleventh Circuit.

## V.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial

evidence is more than a scintilla, but less than a preponderance.  It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[5]

 "In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

 A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

---

  [5] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12

months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 416.920(a)(4)(i)-

(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits. A positive finding at step three results in approval of the

application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled. If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); <u>Chester</u>, 792 F.2d at 131; <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

## V.  Legal Analysis

### A.  ALJ's Rejection of Plaintiff's Proof of Listing

Plaintiff argues that the ALJ erroneously rejected the opinion of Dr. Yauch and the medical evidence in concluding that Plaintiff's severe impairment did not meet or equal Listing 1.04A.  Doc. 14 at 3-6.

The third-step of the five-step process requires the ALJ to compare the claimant's medical evidence to a list of impairments "presumed severe enough to preclude any gainful work."  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 525 (1990).  If the medical evidence meets or equals the listing, then a finding of disability is made.  *Id.*  The claimant's impairments must meet or equal *all* of the specified medical criteria in a particular listing for the claimant to be found disabled at step three of the sequential evaluation process. *Id.* at 530-31.

The burden is on the claimant to prove that she is disabled.  <u>Bell v. Bowen</u>, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); <u>Wilkinson v. Bowen</u>, 847 F.2d 660, 663 (11th Cir. 1987).  To meet a listing, the claimant must show she has been (1) diagnosed with a condition included in the listings and (2) present specific medical findings that meet the various tests listed under the description of the

applicable impairment.  <u>Bell</u>, 796 F.2d at 1353.  A diagnosis alone is insufficient.

20 C.F.R. § 416.925(d) ("To meet the requirements of the listing, you must have a

medically determinable impairment(s) that satisfies all of the criteria of the listing.").

Nevertheless, if the claimant has been diagnosed with a condition described in the

listings, but is unable to provide medical evidence that meets all the criteria, she may

still qualify for the particular listing if there are other findings related to the impairment(s)

that are at least of equal medical significance to the required criteria.  <u>Wilkinson</u>, 847

F.2d at 662; 20 C.F.R. § 416.926(b).

The ALJ does not need to "mechanically recite the evidence" leading to the

determination that the claimant's impairments do not meet the listing criteria.

<u>Hutchinson v. Bowen</u>, 787 F.2d 1461, 1463 (11th Cir. 1986).  In other words, the ALJ's

listing determination need not be explicitly stated, but may be found implicitly in the

ALJ's decision, even if the ALJ goes to the fourth and fifth steps of the disability

analysis.  *Id.*

To meet Listing 1.04A, Plaintiff must show a disorder of the spine and meet or

equal the following criteria:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in compromise of a nerve root (including the
> cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic
>    distribution of pain, limitation of motion of the spine, motor loss (atrophy with
>    associated muscle weakness or muscle weakness) accompanied by sensory

or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).[6]

The ALJ found that Plaintiff had one severe impairment: "thoracic degenerative disc disease with herniated nucleus pulposus." R. 24. In making this determination, the ALJ provided a chronological discussion beginning with Plaintiff's report of falling and injuring her back in 2005; the MRI results in 2005; continued complaints of pain in 2007 and examinations and treatments; additional MRI results; additional treatment, including physical therapy and referrals to pain management in 2007; Plaintiff's September 2009 report of decreased endurance and muscle spasm; continued reports of pain in her back and "describing it in May 2010 as sharp and burning and noted numbness in her leg and hip (Exhibit 19F)." R. 24-25. The ALJ considered Dr. Yauch's evaluations and treatment. R. 25, 27. The ALJ also discussed the results of Dr. Jacob's consultative examination that was performed on August 17, 2010. R. 25, 27.[7]

---

[6] The Commissioner substantially revised the musculoskeletal listing of impairments, effective February 19, 2002. 66 Fed. Reg. 58010 (Nov. 19, 2001).

[7] "Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00E1; *see* 66 Fed. Reg. 58010, 58018 (Nov. 19, 2001) ("We also clarified in final 1.00E1 what we mean by 'motor loss'-that is, atrophy with associated muscle weakness, or muscle weakness alone. Atrophy in the absence of muscle weakness is not evidence of motor loss. We explain in final 1.00E, discussed earlier, what we require to show atrophy."). "After physical examination, Dr. Jacob reported that [Plaintiff] had no tenderness over the spinous processes and no muscle spasms. Straight leg raises were negative. He reported that [Plaintiff] was able to perform toe-walk, heel-walk and tandem-walk and that sensation was normal (Exhibit 21 F). He did report depressed reflexes, absent ankle jerks and downgoing plantar (Exhibit 21 F). R. 24-25; *see* R. 27 (additional findings by ALJ regarding Dr. Jacob's report).

Plaintiff was diagnosed with degenerative disc disease, spinal stenosis, and a herniated nucleus pulposus.  R. 25.  The medical evidence does not establish, however, neuro-anatomic[8] distribution of pain, motor loss, sensory loss, and positive leg raising test (sitting and supine) as required by Listing 1.04A.  Plaintiff complained that her pain radiated down her side.  Dr. Arriola, a neurosurgeon, concluded that Plaintiff did not have "true radicular pain" because the complaints were not consistent with the expected neuro-anatomic distribution of pain.  R. 271.  Further, generally, Plaintiff had normal muscle strength since her alleged onset date of disability.  R. 263-64, 272, 303, 357.  Absent from the record is a finding by an examining specialist that Plaintiff had muscle weakness from 2005 through 2010.  R. 263-64, 272, 303, 357, 437-39.  It is noted, however, that Dr. Yauch, Plaintiff's treating physician, noted some muscle weakness or atrophy in 2009.  R. 349, 381.  Dr. Yauch did not note the same weakness in a subsequent examination note in May 2010, however, nor was such a finding included in Dr. Jacob's August report.  R. 381, 404-05, 437-39.  Likewise, Plaintiff had intact sensation.  R. 272, 303, 357, 438.  Plaintiff also does not meet the criteria for straight-leg raising tests because the medical records do not indicate that the positive tests were performed in both the sitting and supine positions and several such tests were negative.

---

[8]  "[T]he final listing does require 'neuro-anatomic distribution' of pain to make clear that the nerve root compression would have to be reasonably expected to cause the pain."  66 Fed. Reg. 58010, 58018 (Nov. 19, 2001).  "Nerve root compression results in a specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00K1.

R. 274, 303, 381, 404, 438. Plaintiff also walks effectively without an assisted device. R. 342, 386, 442, 441-46.

The medical evidence and medical opinions in the record, including those of Dr. Yauch, do not substantiate Plaintiff's claim that Plaintiff has a disorder of the spine that resulted in "compromise of a nerve root (including the cauda equina) or the spinal cord" *with* "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain" that was "accompanied by sensory or reflex loss *and*, if there is involvement of the lower back, positive straight-leg raising test (sitting *and* supine)." (emphasis added). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

As quoted above, the ALJ's findings regarding this issue under section 3 of her decision are rather conclusory, unlike her findings made throughout the decision. Nevertheless, substantial evidence supports the ALJ's finding that Plaintiff's severe impairment, including the ALJ's discussion of the medical evidence relating to identified issues with Plaintiff's lumbar spine, cervical spine, and thoracic spine, does not meet or equal Listing 1.04A. *See generally* Sullivan, 493 U.S. at 530; *see also* Miller v. Astrue, No. 2:02-cv-650-FtM-DNF, 2011 U.S. Dist. LEXIS 46325, at *15-16 (M.D. Fla. Apr. 28, 2011); Majkut v. Astrue, No. 8:07-cv-1828-T-MCR, 2009 U.S. Dist. LEXIS 30049, at *28-29 (M.D. Fla. Mar. 30, 2009), *aff'd*, 660 F. App'x 660 (11th Cir. 2010).

## B. ALJ's Consideration and Weighing of the Medical Evidence

Plaintiff argues that the Commissioner's decision should be reversed because the ALJ failed to properly address, characterize and weighed the evidence of record, including the opinion of Dr. Yauch, Plaintiff's primary care and a treating physician.

Doc. 14 at 6-10.  Plaintiff further argues that the ALJ erred in giving Dr. Jacob's opinion more weight than that of Dr. Yauch.  *Id.*

Acceptable medical sources provide evidence in order to establish whether a claimant has a medically determinable impairment.  These medical sources include licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, and others.  20 C.F.R. § 416.913(a).   In addition to evidence from the acceptable medical sources, evidence from other sources may be considered to show the *severity* of the claimant's impairment and how it affects their ability to work.  20 C.F.R. § 416.913(d)(1).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R. § 416.927.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 416.927(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, <u>Marbury v. Sullivan</u>, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. <u>Phillips</u>, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." <u>MacGregor,</u> 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. <u>Hillsman v. Bowen</u>, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." <u>Lewis</u>, 125 F.3d a1436, 1440 (11th Cir. 1997); <u>Edward</u>, 937 F.2d at 583 (citing <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th

Cir. 1987)).  Further, where a treating physician has merely made conclusory

statements, the ALJ may afford them such weight to the extent they are supported by

clinical or laboratory findings and are consistent with other evidence as to a claimant's

impairments.  <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986).

Here, the ALJ considered Dr. Yauch's patient notes and opinions in light of the

relevant medical evidence and the opinions of other medical sources, including

Dr. Jacob.  R. 24-28.  The ALJ assigned limited weight to Dr. Yauch's opinion because

her opinion was not supported by the medical evidence, including the objective medical

evidence, and Plaintiff' longitudinal treatment history.  R. 27; 20 C.F.R. § 416.927(c)(2)-

(4).

As explained in 2007 by Plaintiff's neurosurgeon, Dr. Arriola, the most recent

MRIs of the Plaintiff's cervical, thoracic, lumbar spine revealed mild-to-moderate

degenerative changes resulting only in slight cord compression.  R. 271.  The physical

examinations performed by Dr. Yauch revealed few objective findings relating to

Plaintiff's spinal disorders, including some decrease in range of motion, reflexes, and

muscle weakness.  R. 274, 349, 381, 404.  The more in-depth physical examination

performed by neurologists and a pain management specialist generally revealed normal

motor strength, intact sensation, normal reflexes, negative straight leg raises, a normal

gait, and good heel-toe walking.  R. 272-73, 303, 346, 357, 438.

Dr. Yauch was the only physician to opine that Plaintiff was precluded from

performing sedentary work.  R. 386.  Plaintiff's other specialists, including her

neurosurgeon and pain management specialist who reviewed the same cervical,

thoracic, lumbar MRIs, did not opine that Plaintiff's spinal impairments caused any functional limitations or that Plaintiff was disabled.  R. 271-72, 302, 308, 310, 346, 357. Moreover, Dr. Jacob, the consultative examiner, and the state agency physician opined that Plaintiff remain capable of performing at least sedentary work.  R. 371, 441-46.

With regard to treatment, Plaintiff's spinal disorders did not require surgery or emergency treatment following a laser procedure in 2005.  R. 271-73, 310. Plaintiff's neurosurgeon and pain management specialist recommended routine and conservative treatment involving pain management and physical therapy.  R. 273, 304, 310.  At the direction of her pain management specialist, Plaintiff's pain management therapy consisted mainly of taking non-narcotic medication with the use of narcotic medication for break-through pain only.  R. 310.  Plaintiff reported that the medication helped to control her pain.  R. 275, 281-82, 302, 327, 404.  Further, Plaintiff received two steroid injections during the relevant period.  R. 305, 308, 310.

Despite recommendations to undergo physical therapy and Plaintiff's statement that physical therapy helped, Plaintiff attended physical therapy for a limited time in 2007 and was discharged due to non-compliance.  R. 281, 412-13, 449; *see supra* n.3. Also, no physicians concluded that Plaintiff required an assistive device for walking. R. 342, 386, 437-39; *but see* R. 303 (Dr. Zwingelberg noting "[a]mbulation is with assistance").  Additionally, there are gaps in Plaintiff's treatment between December 2005 and March 2007 and between January 2008 and January 2009, although some gaps may be due to Plaintiff's financial situation.  R. 66, 274, 326, 349; *see supra* n.4.

Thus, the objective medical evidence, the medical opinion evidence, and

Plaintiff's longitudinal treatment history do not support the significant functional limitation Dr. Yauch placed on Plaintiff.

The ALJ also reasonably assigned the opinion of Dr. Jacob greater weight than the opinion of Dr. Yauch because Dr. Jacob's opinion was supported by his own findings inconsistent with the other medical evidence. 20 C.F.R. § 416.927(c)(3)-(4). Although it is true that Dr. Jacob did not list all of the medical evidence that he considered, he recorded a brief patient history that is consistent with the record and the results of his physical examination were relatively unremarkable and support his opinion that Plaintiff remained capable of performing sedentary work. R. 437-39, 441-46. Although Plaintiff had depressed reflexes and mild scoliosis in her thoracic and lumbar spine, she had full range of motion in her neck, negative straight leg raises, no paravertebral muscle spasms, no tenderness, normal heel-toe walk, and normal sensation. R. 437-38. Dr. Jacob's opinion is also consistent with the objective medical evidence and longitudinal treatment history discussed above.

The ALJ reasonably assigned greater weight to the opinion of Dr. Jacob than the opinion of Dr. Yauch because Dr. Jacob specializes in neurology, unlike Dr. Yauch. 20 C.F.R. § 416.927(c)(5) (explaining that more weight is given to opinion of specialist about medical issues related to his or her area specialty than to opinion of source who is not a specialist ). Substantial record evidence supports the ALJ's decision to give lesser weight to the opinion of Dr. Yauch.

### C. The ALJ's Credibility Determination of Plaintiff

Plaintiff argues that the Commissioner's decision should be reversed because

the ALJ failed to properly apply the three-part part pain standard used by the Eleventh Circuit.  Doc. 14 at 10-11.

The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.  *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)); Moore v. Barnhart, 405 F.3d at 1212 ("credibility determinations are the province of the ALJ").  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  *See* Wilson, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *Id.*  On the other hand, "[a] clearly articulated finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995).

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225; see Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); 20

C.F.R §§ 416.929 (explaining how symptoms and pain are evaluated); 416.945(e)

(regarding RFC, total limiting effects). This is guidance for the way the ALJ is to

evaluate the claimant's subjective pain testimony because it is the medical model, a

template for a treating physician's evaluation of the patient's experience of pain.[9]

In this case, the ALJ considered Plaintiff's subjective complaints of pain and

found that her medically determinable impairment could reasonably be expected to

cause the alleged symptoms. R. 26. The ALJ noted, however, that the objective

medical evidence and the conservative treatment Plaintiff received ran counter to

Plaintiff's claims of completely disabling limitations. R. 27.

The ALJ reasonably concluded that the medical evidence established mild-to-

moderate functional limitations that would not preclude Plaintiff from performing within

the limits of her RFC assessment. R. 26, 371, 441-46. Plaintiff's MRIs revealed

generally mild degenerative changes with only slight cord compression, and the results

of physical examinations generally revealed normal motor strength, intact sensation,

normal reflexes, negative straight-leg raises, normal gait, and good heel-toe walking

during the relevant time period. R. 271-73, 303, 346, 357, 438. Although Plaintiff

underwent a laser procedure in 2005, she did not require additional surgeries since that

time. R. 273, 310. Rather, Plaintiff required routine conservative treatment involving

pain management and physical therapy. R. 273, 304, 310. Plaintiff received two steroid

---

[9] Although the ALJ did not expressly refer to the three-part part standard, it is clear that the ALJ's findings, discussion, and citation to 20 C.F.R. § 416.929, R. 26, indicate that the pain standard was applied. Wilson, 284 F.3d at 1226.

injections, mainly took non-narcotic medications, and used narcotics for break-through

pain only as instructed by her pain management specialist. R. 310. The medication

help reduce her symptoms. R. 275, 281-82, 302, 327, 404. Although Plaintiff reported

that she benefited from physical therapy, Plaintiff was discharged therefrom for non-

compliance. R. 281, 412-13, 449. Thus, Plaintiff's conservative routine course of

treatment and the other medical evidence supports the ALJ's determination that the

limitations imposed by her physical impairments were not as severe as alleged. *See* 20

C.F.R. § 416.929(c).

   The ALJ may consider a claimant's daily activities when evaluating subjective

complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009,

1012 (11th Cir. 1987); 20 C.F.R. § 416.929(c)(3)(i). *But see* Lewis v. Callahan, 125

F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration,

such as housework or fishing" does not disqualify a claimant from disability). Here,

Plaintiff's level of daily activity also detract from her complaints of disabling symptoms

and pain. Plaintiff visits with her two grandchildren (ages three and seven) four times

per week, takes her two dogs for walks, vacuums, makes the bed, loads the

dishwasher, makes quick meals, watches television, does laundry, shops for groceries

twice a week, drives herself to visit her grandchildren and to the doctor's office, and flies

to Nevada to visit her daughter. R. 61-65. For the most part, Plaintiff also ambulates

without an assistive device. R. 342, 386, 441-46. In light of Plaintiff's level of daily

activity, the ALJ did not err in finding that Plaintiff's subjective complaints were not

entirely credible.

Based on the foregoing, substantial evidence supports the ALJ's credibility determination that Plaintiff's statements regarding her symptoms are not entirely credible.

## VI. Conclusion

Plaintiff has the burden to prove she is disabled. <u>Moore</u>, 405 F.3d at 1211. The record does not support Plaintiff's assertion that she was disabled that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A). Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law. Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on June 20, 2013.

<u>s/ Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**